## BROWN *v.* MEADOR & GRIFFIN.

BLECKLEY, C. J.—The action being by brokers against their employer for advances and commissions, and there being some evidence from which the jury could infer that the transactions involved were not dealings in fictitious " futures," but contemplated actual delivery of the produce purchased, the jury having so found in effect, and the trial judge having approved the finding, this court will forbear to set aside the verdict, although not fully satisfied of its correctness. Upon naked questions of fact, where no error by the court in the progress of the trial is complained of, doubt in the appellate court is to be given in favor of verdicts, and not against them.

May 1, 1889.                          *Judgment affirmed.*

Principal and agent. Futures. Verdict. New trial. Practice in Supreme Court. Before Judge WELLBORN. Hall superior court. August term, 1888.

This was a suit on the following account:

"Meador & Griffin, brokers for R. T. Brown, advanced to Weare Commission Co., of Chicago, Ill., for said R. T. Brown:

| | | | |
|---|---|---|---|
| 250 bbls. June pork bought at $9.75 sold at | ........$ 8 37½ |
| 250 " August " " " 9.25 " " | ....... 8 60 |
| 5,000 bus. June wheat " " .82½ " " | ........ 74½ per bu. |

Commission ¼ cent per bu. on wheat. ............... 12 50
    "      5 cent  "  bbl.  "   pork...... ........... 25 50
Total loss and commission...........................$918 75
Less amount rec'd of R. T. Brown................  69 00          $849 75."

Brown pleaded the general issue, and special pleas to the effect following :   On the 29th day of March, 1886, he instructed plaintiffs to purchase for him 5,000 bushels of .May wheat for 81 cents or lower, and funished the required amount of money for the margins to meet exigencies of the market during the continuance of said contract, but plaintiffs totally neglected and refused to carry out his instructions with regard to said wheat, but on the contrary, purchased or pretended to purchase for him 5,000 bu. of June wheat at 82½ cents per bu., and this pretended purchase purports to have been made six days after instructions given, which delay was contrary to all precedents and rules governing such instructions.   He admits that, in the early part of 1886, he did authorize plaintiffs to purchase pork on his account pursuant to his instructions, and said purchases being made, he paid the margins, sustained the fluctuations of the market, and, although there seemed to be a general decline in the market, continued to back up his contract until, growing tired of constant loss and seeing no prospect of early improvement in prices, on April 24, 1886, he positively and unequivocally directed plaintiffs to close out the transactions, and that he would thereupon meet the result whether loss or gain, but that in no event would he pay up more money. But notwithstanding these instructions, plaintiffs, of their own accord, refused to close out the transactions, and on the 30th day of April, 1886, without authority, transferred the same from May to August, thus relieving him from all liability to respond to their demands. He was ready and willing to comply with all his obligations, and he avers that if his instructions had been followed, plaintiffs would not have had any demand against him.   His last plea set up that the transactions

were gambling contracts, or what are known as " futures."

Griffin testified as follows: Plaintiffs advanced the whole amount of the account, and the account is correct and due. Made advancements under Brown's instructions as broker or agent. Had understanding with Brown that plaintiffs were to keep his margins good. After the market went against Brown, I called on him for $500, and understood from him he received the letter, but he did not reply to it. About the first of May, we had a conversation with him and told him we wanted him to pay what was due on his deal, and he said he would not do it, and we sold him out, as is customary. We always made these contracts for him as authorized. We did not sell the stuff ourselves.; we just simply acted as brokers or agents. Contracts were all made through Weare Commission Co., in Chicago, Ill. Brown understood this. He commenced to deal with us in the fall of 1885. We bought him 250 bbls. of June pork on March 18, then on April 3rd we bought him 5,000 bu. of June wheat, and April 30, 250 barrels of August pork; all in the year 1886. June wheat and June pork means pork or wheat to be delivered in June. The rule is, when a man buys stuff for future delivery, a certain amount of margins have to be put up to cover fluctuations in prices of goods. Brown knew this. We lost all this suit is for; decline covered amount advanced. Witness made advance to Weare Commission Co.; deposited general sum. Had other previous transactions for Brown, and it was our custom to notify him when we had to make advances, and he would make deposits from time to time. After loss on other deals, there were $69 to his credit, which sum is credited on the deals sued for. He instructed us to buy June pork, by telegram received March 18, 1888. We always bought when he instructed us to do so. If he did not have the money, we bought just the same, putting up

advances for him.   We had instructions from him to this effect, verbal and written.   We bought the August pork April 30.   Brown had at that time 250 barrels of May pork, and May 1st was delivery day, and we transferred it to August pork, notified Brown, and have his letters in reply.   Checks mentioned in his various letters and telegrams were received and applied to his account on these different deals as margins.   The custom was, if we received instructions on a certain day to buy, we would place the order, and as soon as the market touched that point it would be executed, unless there were some extenuating circumstances.   We received a telegram from Brown, on March 29, to buy 5,000 bushels of May wheat, and by mistake the telegram read 80 or under, whereas it should have been 81 or lower.   We placed our order to buy at once, but could not get wheat at that price, and about three days later, received a corrected telegram, and information from Brown that this telegram read 81½.   I do not know whether I could have complied with the order to buy him wheat at 81 or lower from the time I received the order up to April 3rd when the June wheat was bought.   Never bought the May wheat but bought June wheat upon instructions of March 21st.   Bought it under instructions in our correspondence with Brown, but in this way : we have instructions from Brown that he would rely on our discretion in the matter, and we bought June wheat from the fact that if he bought May wheat he would have to sell out or transfer in a short time.   We bought June wheat as a matter of discretion on our part, all for Brown's benefit.   I was buying through the Weare Commission Co. for Brown 5,000 bushels of wheat, and simply wired them to buy according to their judgement. We never had seen a bushel of that wheat or a pound of that pork.   When we sent these instructions, we never had any understanding to have any wheat.   Don't know whether the Weare Commission Co. had wheat, or

whether we expected them to have it. There were thousands of people carrying on this thing, and Brown understood this stuff was deliverable, and if he did not have it sold out he would have to pay for it. Never asked Brown for the whole amount of what the wheat and pork were worth, and did not know whether he could pay for it or not. Bought pork and wheat in name of Meador & Griffin, but they were notified that Brown was the man we were buying for. Meador & Griffin became responsible. We looked to Brown, and the Weare Commission Co. looked to us. We put up the margins for them. We did not have any instructions about closing out these deals after they were bought. On April 24th, had a conversation with Brown, and he asked if he could not pay up a stipulated amount on a deal and not lose any more than that amount if it went against him. I told him we could not do a bucket shop business. Practically we had wheat and pork, but not actually. We had contracts for it, which took the place of the stuff. We had elevator receipts which were negotiable and responsible, and we sell that way without seeing the stuff. We got 74½ cents a bushel on the wheat. Spot wheat is sure enough wheat. This was not spot wheat or pork. The Weare Commission Co. just bought this wheat and charged the loss to Meador & Griffin. This is the usual custom in the brokers' business. Delivery is contemplated in every transaction we make. There was no understanding that this was not a *bona fide* trade, or that actual delivery was not contemplated. Every member of the Chicago board of trade knows that delivery is contemplated in every transaction. He can deliver goods, and party has a right to tender when the contract expires. Contracts are made through the Weare Commission house for both spot and future delivery. Brown knew I was trading through board of trade. The contract with him was this kind of contract, and actual delivery was contem-

plated. Brown made no complaint and no objections to our closing out these contracts. On April 3rd, I wired Brown that we had bought 5,000 bushels of June wheat at 82½ or 82⅝. On April 5th, I quoted him the market, and we never received any notice that the contracts were not satisfactory until this controversy was raised here. (The witness indentified various letters and telegrams, hereafter to be mentioned, as having been received or sent in these dealings for Brown.) Brown knew we were carrying the June contract of wheat, and the first information we had that he was going to repudiate anything was on May 27th. He never told me he would not put up any more money. These contracts were made on the actual goods. It was not a rule when a man's margins were exhausted that he was closed out; that is a bucket-shop rule, but not our house's rule. Brown was the only ·one that we had to sell out. I don't know that I told him we were selling him out.

Brown testified as follows : Telegraphed plaintiffs, March 29th, to buy me wheat at 81 or lower, and notified them as to where I would be from time to time. Received their letter at Cornelia, and telegraphed them if they had not bought the wheat not to buy. I came on down to Buford and received a telegram from them, saying they had bought June wheat at 82½, and when I I got home, I received a letter from them saying they had received my telegram, but had already bought the wheat, but deemed it necessary to wire me. I went down to Atlanta and told Griffin he had lost my money by not following instructions, and that I would not be responsible for the June wheat at all. I never authorized them to buy any June wheat. They bought me 5,000 bushels of June wheat according to instruction of my letter of March 21st. I gave them orders on March 22d, to close this June wheat, and they did on March 27th. I sent telegram from Gainesville about 9.30 I suppose, and the bucket-shop in Atlanta to

which Griffin and I had gone to see quotations, opened about ten or half past. On April 24th, I told Griffin to close my deals when my margins were exhausted; that meant that if I was closed out I would lose what I had in it; the money I had to my credit with them. Was a traveling man and had been accustomed to leave my schedule with them, and left it with them one week after this transaction, and after that never left it any more or paid any more attention to it, until along in May they wrote and called on me for $700. I paid no more attention to it because they did not follow my instructions If they had done so, I would have come out about even. I was not buying wheat expecting to get wheat. My understanding was that it was a little future deal. There was no delivery of wheat or pork, and when I ordered them to buy me wheat at a given price it was betting on the difference in the price paid and the price sold for. All account sales are made out in writing. Griffin was to account to me for the difference between the prices paid and the prices sold for. The wheat was the last transaction, and I never got that. Cannot say I ever employed them as my brokers. I went in there and told them I wanted to buy some wheat, and they said they would sell it to me. I went over and left it to their discretion as to when to buy, once or twice. I didn't think that the wheat or pork would have been delivered to Meador & Griffin if it had not been sold or transferred. I ordered them to buy this pork, and on April 24th, told them to sell when my margins were exhausted. When I lost, they did not gain; some other fellow that was bucking against me gained it. They were working for the commissions, I suppose. I stopped when I told them I would not advance any more margins. I could have closed out that day about even; they claimed that they owed me $360 on that day, but I did not think they owed me so much. When I went to buy, I wired them

to buy me such goods as I wanted, and if they failed to buy that day, that telegram would be void. I know nothing as to doing business by warehouse receipts, or about this purchase to have been made in Chicago, or about Chicago. I did receive the letter of May 3d, but do not think I paid any attention to it. I know nothing about the Weare Commision Co. I knew, on April 3d, they had a June contract for me, and on April 5th I told them I would have nothing to do with it. I had pork there at the time and never settled. I knew they were using my money, if they were using any at all. When I first contracted the deal with them, they were to notify me and I would put up the margins. I only caught on to the Weare Commission Co. by the correspondence. It was no business of mine with whom Meador & Griffin corresponded, and I had no occasion to ask them with whom they were dealing. I did not deal with the Weare Commission Co. My understanding is that an order must be filled the day it is received, and cannot be executed the day after the order, unless the order stated it was left open. My telegram would not authorize any order to be filled six days after.

A large number of letters and telegrams were introduced, many of which it does not seem nescessary to report, and others need only be stated in a condensed form. The letters written by Brown to plaintiffs in the beginning of the deals between them included checks for various amounts, and repeatedly requested that plaintiffs would not let him be "squeezed out," for he was ready to put up more margins, and if more money should be needed, he asked to be so advised. In a letter of September 3, 1885, he wrote them that they could use their own judgment as to whether a purchase of wheat for him should be of November or December wheat, and on October 25, 1885, he wrote them that he was glad that they bought November instead of December wheat. On March 5th, 1886, Brown wired them,

"Buy 250 barrels May pork 10 or lower"; and on March 5th, sent letter to the same effect. On March 15th, he wrote them that he had received their telegram, "Bought 250 May pork 9.85, send 200 or 300 margin." On March 18, 1886, he wired them, "Buy 250 June pork if think best. Check follows." On the same day they wired him that they had filled his order; and on the same day wired the Weare Commission Co., "Abdicate June." On the same day, they wrote to Brown notifying him that they had filled his order, and advised him to close his deals when he saw a moderate profit, as he could always buy again with the chance in favor of lower prices. On March 19, 1886, he wired them, "If think best close June pork at 95 or higher"; on the same day they wrote him that his telegram was received too late to close at more than 75, and so they did not close, but if the market should reach 95 the next day they would order his pork closed, unless otherwise ordered by wire. On March 22d, he wired them, "Buy 5,000 May 82 quarter or lower," and had written to them the day before to buy 5,000 May or June wheat at a rate named by him, and whenever it advanced to a sufficient point to get him out whole on the contracts, just let them go. On March 22d, he wrote them saying that he had received their telegram that they had bought 5,000 May wheat, and asking them to close the wheat when they could get him out whole, and close the pork at 20 to 30 a barrel profit, unless they saw chance of a big advance. On March 23d, they wrote him that they had received his telegram, and that they had received his letter on the 22d, and on receipt of his letter had immediately given instructions to close his June pork, but as they had received no reply presumed their telegram had reached Chicago a few minutes too late, though it may be "extended to to-morrow's opening." On March 27th, they furnished memorandum of the purchase of 5,000

bushels of May wheat for Brown on March 22d, and of its sale on March 27th, showing a small profit. On March 29th, they telegraphed Brown, giving quotations of May wheat at $80\frac{3}{4}$. On the same day he telegraphed them, " Buy 5,000 May wheat 81 or lower," and on the same day wrote them that he had telegraphed them to buy 5,000 May wheat at 81 or lower, and on the same day wrote them another letter enclosing a list of the places at which he would be during the next week. On March 29th, they wrote to him, " Your telegram to-day received, and we have wired Weare to buy 5,000 May when it reaches 80 cents." On March 30th, they wrote him, " Your favor of the 29th received and noted. We put in your order to buy 5,000 May wheat when it touches 80, but it did not go there to-day." On April 1st, they wired and wrote him giving market quotations, directing the letter to him at Rabun Gap. On the 2d of April, he telegraphed them, " My telegram and letter said buy May wheat 81 or lower." On the same day, they wrote him to Buford that his telegram was received and that they had corrected their order to Chicago correspondent to raise his limit to 81 May, and and $82\frac{5}{8}$ for June, and had wired them if they thought best to buy June to do so, as May was so close. On April 3rd, he wired them, " If you haven't bought May wheat, don't any." On the same day, they wired to him at Buford, " Bought 5 June 82 half," and on the same day wrote to him at Gainesville that they had received his dispatch, but as they had already wired him to Buford, did not deem it necessary to reply to his telegram. Various letters and telegrams then passed between them, giving market quotations, etc. On April 30th, they wrote him that his May pork would have to be delivered next day unless sold or transferred, and as they did not know where to strike him with telegram to get instructions, they had wired Weare to transfer his May pork to August pork, and on May 3rd, they

enclosed him account of sale of May pork and invest-
ment in August pork, and told him that the Weare
Commission Co. had drawn on them for $500 on ac-
count of the margins on his deal, and asked him to help
them out all he could. In the same letter they gave
him an account of how his deal stood with them, and
among other things, mentioned " 5,000 June wheat at
82½." On May 2d, he wrote them that he had received
their letter of the 30th, and he was glad they had his
May pork transferred to August, and stated that he en-
closed his schedule for that week. On May 26th, he
wrote them from Toccoa that he had received their let-
ter of the 25th (this letter does not appear in the
record) ; that he told them the last time he had a talk
with them that he would not put up any more margins on
his deals, but in the future he would put up the re-
quired margins, and then give or take, and that they
agreed with him, so that since the steady decline for
sometime he had been resting as easy as possible with
his squeeze out, etc. On May 27th, they wired him,
" No such instructions on present deal . . . telegraph
us order . . . for $900 quick, will transfer deal." On
the same day, he wired or wrote them from Toccoa that
if they had held deals it was at their risk, and that he
had told them positively that he would not put up more
money. There appears in the record, among these letters
and telegrams, an account dated May 27, 1886, corres-
ponding substantially to the account sued on, but
whether it was furnished to Brown does not appear.

There also appear in the record, as part of the testi-
mony introduced on the trial, various letters and tele-
grams from the Weare Commission Co. to Meador &
Griffin. On March 30, 1886, they wired Meador &
Griffin, "Could not buy wheat at daring, and we con-
sidered order off." On April 2d, they wrote to Meador
& Griffin, "Your Y–D of this date is received, but it
came too late to do anything, so we wired you if

we should consider the order off to-morrow." On May 22d, they wrote to Meador & Griffin, asking what instructions they had to give concerning their June wheat, as it was very liable to be delivered to them on the first of the month; and the record contains their account of the deal in question stated as "account purchase and sale by P. B. Weare Co. for account of risk of Meador & Griffin, Atlanta, Ga."

The jury found for plaintiffs. The defendant moved for a new trial on the grounds that the verdict was contrary to law and evidence, and because the indebtedness charged by plaintiffs to defendant is for losses arising out of transactions in futures, and is illegal, immoral, against public policy and void, and cannot be enforced in any court. The motion was overruled, and defendant excepted.

F. M. JOHNSON and J. B. ESTES, for plaintiff in error.

PERRY & DEAN and FULTON COLVILLE, contra.