ASSOCIATED MUTUALS INC. *v.* POPE LUMBER COMPANY *et al.*

No. 15360.  February 21, 1946.  Rehearing denied March 5, 1946.

*Lawson E. Thompson,* and *Clapp & Gaines,* for plaintiff.

*W. A. Slaton,* for defendants.

CANDLER, Justice. (After stating the foregoing facts.) ■ We shall deal first with the assignment of error on the exceptions pendente lite to the overruling of the plaintiff's oral motion to strike paragraph 2 of the answer in its entirety, because it contained inconsistent or contradictory defenses. "No part of an answer shall be stricken out or rejected on account of being contradictory to another part of the same, but the court shall suffer the whole answer to remain, if the defendant should desire it, and avail himself of any advantage he can or may have under either or the whole of said answer, and proceed to trial accordingly." Code, § 81-310. It is, of course, well-settled law in this State that the defendant has the right to file as many inconsistent or contradictory pleas as he deems necessary for his defense, and this court has so held on many occasions. See *Rigden* v. *Jordan,* 81 *Ga.* 668 (7 S. E. 857); *Jones* v. *Forehand,* 89 *Ga.* 520 (16 S. E. 262, 32 Am. St. Rep. 81); *Wade* v. *Watson,* 129 *Ga.* 614 (59 S. E. 294); *Mendel* v. *Miller & Sons,* 134 *Ga.* 610 (68 S. E. 430); *McGinty* v. *Keith,* 182 *Ga.* 869 (187 S. E. 79); *Hadden* v. *Fuqua,* 194 *Ga.* 621 (22 S. E. 2d, 377). Having stated this elementary principle of law, we do not deem it necessary to further discuss this assignment of error, since the defendants during the trial of the case, when the oral motion to strike was made, voluntarily elected to amend their answer so as to relieve it from the inconsistency complained of; and this, of course, they had a right to do under the Code, § 81-1301, which provides that "All parties, whether plaintiffs or defendants, in the superior or other courts, whether at law or in equity, may at any stage of the cause, as a matter of right, amend their pleadings in all respects, whether in matter of form or of substance, provided there is enough in the pleadings to amend by." With the plea of tender thus stricken by amendment, the case proceeded to trial upon the sole defense that

the defendants were not liable because they had not contracted with the plaintiff for any policy of insurance, and the court did not err in overruling the motion to strike. .

■ In the first ground of the amended motion for new trial, the plaintiff contends that the court erred in charging the jury that a contract of insurance is not complete until both parties have agreed to all its terms, without also charging that the burden of proving that the policies of insurance were not accepted was on the defendants. There is no merit in this contention. "A contract is an agreement between two or more parties for the doing or not doing of some specified thing." Code, § 20-101. "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject-matter upon which it can operate." Section 20-107. "The consent of the parties being essential to a contract, until each has assented to all the terms the contract is incomplete; until assented to, each party may withdraw his bid or proposition." Section 20-108. In the instant case, the trial judge charged the jury that the burden was on the plaintiff to establish its contentions by a preponderance of evidence. The suit was on open account, and the burden was upon the plaintiff to show that there had been a contract between itself and the defendants as a basis of the indebtedness. *Lumber Insurance Co. of New York v. Henderson Lumber Co.*, 16 *Ga. App.* 756 (86 S. E. 60). To carry this burden, it was necessary for the plaintiff to show, by a preponderance of evidence, every necessary essential of a valid contract, which, of course, included the acceptance of the policies of insurance by the defendants after they had unconditionally assented to all the terms of the contracts. Conversely, no burden in this case rested upon the defendants to disprove any of the essentials of a valid contract.

■ Special grounds 2 and 3 of the amended motion for new trial complain of the admission of testimony offered by the defendants, over the objection that it was prejudicial, tending to show that the defendants declined to accept the policies of insurance because the rates were too high; and special ground 4 complains of the refusal of the court to rule out such evidence on motion duly made. Objections were urged to this testimony because of the contradictory defenses originally made by the de-

fendants in paragraph 2 of their answer, as pointed out and dealt with in division 1 of this opinion. When the answer was amended by striking the plea of tender, the case proceeded to trial upon the sole defense that the defendants had not contracted with the plaintiff for any insurance protection, and unquestionably any evidence which tended to support such contention was admissible and very material to the only issue involved in the case. The three grounds, therefore, show no error.

■ On the general grounds of the motion, it appears from the record that the defendants had carried insurance, with companies represented by the plaintiff, for two or three years immediately prior to the issuance of the policies here involved. About a month before the expiration date of existing policies, but without any request to do so, the plaintiff forwarded the policies in question to the defendants by mail. On examination it was found that the premiums charged had substantially increased over those of previous years. M. P. Pope, manager of Pope Lumber Company, immediately called on the plaintiff and complained about the rate placed on his business and the premiums being charged, and stated that the same coverage could be secured from competing companies at around $800 cheaper. He made two other personal visits and discussed the same matter. With reference to these visits and the conversations, while testifying as a witness for the defendants, he stated on direct examination: "I most assuredly told them in that first conversation that I could not accept the insurance unless they made a proper rate," and on cross-examination he said: "When I went there the first trip, I told them I would not take the insurance. If you want to say that is a cancellation, you can call that a cancellation, but the matter was held open to decide whether they would make the right rate or not." On March 28, 1944, the plaintiff wrote to the defendants as follows: "As I told you last Friday, we had definitely concluded the rate on your plant was somewhat out of line and after discussing the matter with Mr. Sheffield and Mr. Herrin, of the Lumber Rating and Inspection Bureau, we have effected a reduction on several units in your plant; the main reduction being on the yard, and on this unit the rate was reduced from $3.30 to $2.547 and the rate on your mill unit was reduced from $3.49 to $3.25. With these reductions on the basis of the present coverage,

the total cost of insurance to you would be $1956.80 annually, and with the present rate of dividend of 20%, the net cost would figure $1565.44. I am pleased to attach hereto endorsement making the reduction as outlined above and also credit memorandum showing an amount due you of $469.79. We trust that this reduction will enable us to continue our coverage on your plant and wish to assure you that at any time we can be of service we will appreciate your calling on us." On April 3, 1944, the defendants wrote to the plaintiff: "We have your letter of March 28th with reference to our lumber, and note that you are willing to reduce the rate from 3.30 to 2.547 and on the mill units a reduction from 3.49 to 3.25. We have had a definite offer that we can carry all this insurance for a flat price of $1700, carrying the same 20% dividend, which would mean a net cost to us of $1360 per year. Your net is $1565.44 or $205.40 higher than your competitor's. We are suggesting that you make the lumber rate 2.25 and the mill rate a flat 3.00, which makes a total premium of $1735.50. Even at this, we would be paying you $35.00 more per year than we can get it written for, but we like to do business with you and hope that you can see your way clear to make these rates. Kindly let us hear from you promptly." On April 5, 1944, the plaintiff wrote to the defendants: "I was somewhat disappointed to note from your letter of April 3 that the rate which we quoted in our letter of March 28 was not satisfactory. Of course, it is possible to secure insurance with some of our competitors at a rate under that which our companies find it necessary to charge. Incidentally, these companies do not have sufficient volume of this class of business to definitely establish the loss ratio and expense incident to handling the coverage, and after a few years they find that they are losing money and cancel their policy. . . We feel that we are doing a good job for our assureds and hold our insurance costs to a minimum. We, of course, would dislike exceedingly to discontinue our pleasant relationship which we have had with your good firm, and hope that after considering the foregoing facts you will agree with us that our office can handle your insurance requirements better than our competitors." On May 26, 1944, the defendants wrote to the plaintiff: "We wish to advise that the reason we have not sent you a check for the insurance premium as covered by your invoice, is that we think the

rate is too high, or rather we have not been exactly satisfied that the rate was as low as it should be. We have made several changes and improvements since your rating man was here, as your fire inspector who was here the first of this week will tell you, and we would appreciate your sending your rating man down as soon as possible to re-rate the plant." On June 7, 1944, the plaintiff wrote to the defendants: "We have your letter of May 26 with reference to the rate on your risk. As I pointed out to you when you were in our office several weeks ago, the rate which we have established on the manufacturing units on your plant is the absolute minimum with which our company would accept the business. You can effect a reduction, however, if you maintain one hundred foot clear space between your mill and the lumber on the yard. Mr. Reeves pointed this out to you at the time of his inspection under date of May 23. Just as soon as you have cleared this space, we will be pleased to re-rate your plant." On June 12, 1944, the defendants wrote to the plaintiff: "The writer has told you repeatedly that the rate being charged is too high. We told you we could get it written at a less rate. When you declined to make a better rate, we had nothing else we could do but notify you we felt the rate was too high. As you don't seem willing to reduce the rate, there is nothing else for us to do but cancel the insurance and if you will please figure up the time you carried the risk and give us credit for the dividend due us on the coverage last year, and advise us, we will appreciate it. We are sorry." On July 3, 1944, the plaintiff wrote to the defendants: "We have not yet received your check for the balance due on fire insurance policies effective March 12, 1944. After applying the credit of $469.79 representing reduction in rate under your policies, there remains a net balance of $1703.86, which amount was summarized in our letter of May 19. We know that there must be some good reason why you have not sent us your check to clear this account, but the records of our accounting department do not indicate a reply to our previous letter, or any explanation from you as to why payment is being withheld. May we please have your check for $1703.86, or a letter of explanation from you regarding this past due balance? Your prompt co-operation will be very much appreciated." On July 7, 1944, the defendants wrote to the plaintiff: "We are exceedingly sorry it has turned out this way, and

if you feel that we owe you anything from March 12, till we told you we would have to cancel out, let us ·have your· statement of what we owe you and what you owe us. We are returning the policies and regret the necessity." After several other letters between the parties, the defendants wrote to the plaintiff on September 21, 1944, as follows: "We have your letter about what you claim we owe you, and below we show you in figures what we do owe. . . We are enclosing check in the amount of $136.91 in full payment of account due you. This is figured on the basis of non-payment of premium, prorated."

Was there, under the facts of this case, a completed contract between the parties? If so, under the stipulation, the plaintiff is entitled to recover the full amount sued for, otherwise nothing. "A refusal to accept a policy, which is tendered without any request for its issuance having been made, renders the policy void ab initio." 1 Couch, Encyclopedia of Insurance Law, 168, § 93. With respect to the right of an insured to reject a renewal policy, the generally accepted rule is that the delivery of a policy by the insurer to the insured, upon the expiration of a policy, without a request by the insured, is an offer or proposal which must be accepted by the insured before a contract of insurance is effected. Likewise, an offer by letter to renew a policy does not effect a contract unless accepted by the insured, and mere delay in rejecting a renewal policy does not amount to an acceptance which will continue the policy in force. Couch, supra, p. 171; *Harper & Co.* v. *Ginners Mutual Ins. Co.*, 6 *Ga. App.* 139 (64 S. E. 567); *Pennsylvania Fire Ins. Co.* v. *Sorrells*, 23 *Ga. App.* 398 (98 S. E. 358). "While a contract can be made by correspondence through the mail, or by telegram, the offer of the seller must be accepted by the purchaser unequivocably, unconditionally, and without variance of any sort, and must be a mutual assent of the parties, and they must assent to the same thing in the same sense." *Robinson* v. *Weller*, 81 *Ga.* 704 (8 S. E. 447); *Stix* v. *Roulston*, 88 *Ga.* 743 (15 S. E. 826); *Harris* v. *Amoskeag Lumber Co.*, 97 *Ga.* 465 (25 S. E. 519); *Larned* v. *Wentworth*, 114 *Ga.* 208 (39 S. E. 855); *Harper & Co.* v. *Ginners Mutual Ins. Co.*, 6 *Ga. App.* 139, 142 (64 S. E. 567); *Pennsylvania Fire Ins. Co.* v. *Sorrells*, 23 *Ga. App.* 398 (98 S. E. 358). On the trial of this case, the jury returned a verdict in favor of the defendants, which

verdict has the approval of the trial judge. This court has held in so many cases that a verdict supported by any competent evidence, which has the approval of the trial judge, will not be disturbed, that we now deem it unnecessary to cite again those authorities. However, in the fairly recent case of *First Joint Stock Land Bank of Montgomery* v. *Sasser,* 185 *Ga.* 417 (195 S. E. 143), Mr. Justice Grice, speaking for this court, said: "The motion for a new trial contains only the grounds that the verdict is contrary to the evidence, and without evidence to support it; that it is decidedly and strongly against the weight of the evidence; and that it is contrary to law and the principles of justice and equity. Under this situation, the verdict having received the approval of the trial judge, there is, under repeated rulings, but one thing that this court can consider: are the material issues supported by any evidence? An examination of the brief of evidence convinces us that the verdict is not unsupported as a matter of law." Code, § 20-107, supra, giving the essentials of a contract, is a codification of simple elementary principles of law, and a valid contract is never complete until the parties assent to all the terms of the proposed contract in the same sense. The premium to be charged on a policy of insurance is, of course, one of the essential terms of that contract, and until an agreement is reached with respect to it no contract exists. As to this essential part of the purported contract, M. F. Griffith, who was in charge of the fire-underwriting branch of the plaintiff's office, and who was a witness for the plaintiff, testified: "As a matter of fact, I and Mr. Pope never did reach an agreement about what was a satisfactory premium." While the defendant Pope, in his letters of June 12 and September 21, employed language which would tend to indicate that he had accepted the policies, and desired to cancel them and to pay the plaintiff for the risk carried, yet the jury had the right to construe such language in the light of all of the other facts and circumstances of the case. While these letters tended not only to impeach the witness Pope, but also, as admissions, to prove the plaintiff's cause, yet being only evidentiary, they did not as a matter of law refute his sworn testimony. *Bailey* v. *Warlick,* 196 *Ga.* 642 (27 S. E. 2d, 322). It is the duty of this court to construe the evidence most strongly in support of a verdict which has been approved by the trial judge. *Brown* v. *Meador,* 83 *Ga.* 406 (9 S. E. 681).

Under our view of all the facts in this case, the defendants never assented to the terms of the proposed contracts of insurance—they never agreed on the premiums charged; the evidence supported the verdict; and the trial judge did not err in overruling the motion for a new trial on the general grounds thereof.

*Judgment affirmed. All the Justices concur, except*

ATKINSON, Justice, dissenting. I dissent from the rulings upon the general grounds of the motion for new trial, for the reason that I think the evidence demanded a verdict for the plaintiff in the court below.