Blanche **GENTRY**, Plaintiff

v.

**BEVERLY ENTERPRISES–GEORGIA INC. d/b/a Golden Living Center–Windermere f/n/a Beverly Healthcare–Windermere, Defendant.**

Case No. CV 108–042.

United States District Court,
S.D. Georgia,
Augusta Division.

Feb. 13, 2009.

**1226**

Joseph R. Neal, Jr., Joseph R. Neal, Jr., PC, Augusta, GA, for Plaintiff.

Christian J. Lang, David C. Marshall, Patricia M. Peters, Hawkins & Parnell, LLP, Atlanta, GA, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LISA GODBEY WOOD, District Judge.

Plaintiff Blanche Gentry filed the above-captioned case on April 9, 2008, against Defendant Beverly Enterprises–Georgia, Inc., asserting claims for ordinary and professional negligence, negligent supervision, and violations of certain federal nursing home regulations, codified at 42 C.F.R. Section 483.25.

On May 6, 2008, Defendant filed its answer and moved to dismiss Plaintiff's complaint, compel arbitration, and stay discovery, claiming that the parties entered into an arbitration agreement upon Plaintiff's admission to Defendant's nursing home. Because Plaintiff unequivocally denied that an agreement to arbitrate was reached, and because she substantiated her denial with "some evidence" as to create a genuine issue of fact, the Court granted Plaintiff's request for a trial on the issue of arbitrability pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C., Section 4. *See Chastain v. Robin-*

*son–Humphrey Co.*, 957 F.2d 851, 854 (11th Cir.1992) (to warrant trial on the issue of arbitrability, party seeking to avoid arbitration must "unequivocally deny that an agreement to arbitrate was reached and must offer 'some evidence' to substantiate the denial."). The Court ordered that Defendant's motion to compel arbitration be stayed pending resolution of this issue at trial.

On January 21, 2009, the Court held a bench trial on the issue of arbitrability. After hearing witness testimony and considering the evidence tendered, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### *FINDINGS OF FACT*

1. On April 11, 2006, while Plaintiff was recovering from hip surgery, she was admitted to Beverly Healthcare–Windermere, Defendant's nursing home in Augusta, Georgia. Transcript at 32, 88. Doc. No. 42.

2. At the time she was admitted to the nursing home, both of Plaintiff's wrists were fractured. Due to these fractures, Plaintiff had braces on both of her wrists. *Id.* at 11–13, 71, 86, 88.

3. At the time she was admitted to Defendant's nursing home, Plaintiff exhibited normal cognitive functioning. She was alert and oriented and was able to communicate orally with nursing home staff. *Id.* at 14, 21–22, 67–68, 86, 89.

4. At the time of Plaintiff's admission, Sharon Millsap was the executive director of Defendant's nursing home. *Id.* at 28.

5. Ms. Millsap handled Plaintiff's admission. *Id.* at 30.

6. Included in the packet of admissions paperwork eventually signed by Plaintiff's husband, Mr. Ronald Gentry, was a document entitled "Resident and Facility Arbi-

tration Agreement." Defense Exhibit 2, p. 1–3. In bold letters immediately following the document title appear the words: "Not a condition of admission." *Id.* at 1.

7. The arbitration agreement provides that, upon execution, the agreement becomes part of the Admissions Agreement. *Id.*

8. The arbitration agreement also provides that:

[A]ny and all claims, disputes, and controversies ... arising out of, or in connection with, or relating in any way to the Admission Agreement or any service of health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the Parties ....

*Id.*

9. The arbitration agreement also provides, in bold and capital typeface, that:

The parties understand and agree that this contract contains a binding arbitration provision which may be enforced by the parties, and that by entering into this arbitration agreement, the parties are giving up and waiving their constitutional right to have any claim decided in a court of law before a judge and a jury, as well as any appeal from a decision or award of damages.

*Id.* at 2.

10. It is undisputed that Plaintiff did not sign the arbitration agreement at issue. Transcript at 18–19, 33, 49, 86. This is confirmed by testimony at trial as well as a copy of the arbitration agreement entered into evidence wherein the space reserved for the resident's signature is blank. Defense Exhibit 2, at 2.

11. Below the space reserved for the resident's signature, the following text appears: "If the resident is unable to consent

or sign this provision because of physical disability or mental incompetence or is a minor and an authorized representative is signing this provision, complete the following." *Id.*

12. Immediately below this provision, the arbitration agreement was signed and dated by Ronald Gentry, in the space designated for the authorized representative's signature. *Id.* Above this, in a space marked "relationship to resident," the word "spouse" was written. *Id.*

13. Below Mr. Gentry's signature, Ms. Millsap's signature appears in the space designated for "witness," as well as in the space designated for the signature of the facility's authorized representative. *Id.* at 2–3.

14. According to Ms. Millsap's testimony, Millsap brought a stack of paperwork, including the arbitration agreement at issue, to Plaintiff's room on the day Plaintiff was admitted to the nursing home, and told her that the paperwork had to be completed. Transcript at 32. Ms. Millsap told Plaintiff that this was the "admission paperwork required for admission" and that someone would have to sign it. *Id.* at 33; 52–53.

15. Ms. Millsap testified that Plaintiff told her that "her husband [Mr. Gentry] would be taking care of this for her." *Id.* at 32.

16. According to Millsap, Plaintiff told her that Mr. Gentry would not be available until he got off work later that evening. *Id.* at 32–33.

17. According to Ms. Millsap, she then contacted Mr. Gentry on the telephone and told him that the admissions paperwork had to be completed and asked if he could come to the nursing home. *Id.* at 34. According to Ms. Millsap, Mr. Gentry told her that he could not come to the nursing home during the day and that it would be later in the evening before he could stop by. *Id.*

18. Ms. Millsap testified that she agreed to leave the admissions paperwork in Plaintiff's room for Mr. Gentry to complete and sign when he arrived later that evening. *Id.* at 34. Ms. Millsap further testified that she did, in fact, leave the paperwork in Plaintiff's room and that she told Plaintiff that she was doing so. *Id.* at 34–35.

19. According to Ms. Millsap, when she picked up the paperwork the next day, all of the paperwork had been signed by Mr. Gentry, including the arbitration agreement at issue. *Id.* at 35–36.

20. Plaintiff's version of events differs significantly. According to Mr. Gentry, he received a call in the early afternoon of April 11, 2006, informing him that Plaintiff was being transferred from a hospital to Defendant's nursing home. *Id.* at 57.

21. Mr. Gentry testified that within twenty minutes of receiving this call, at approximately two o'clock P.M., he arrived at the nursing home. *Id.* at 57, 64, 69.

22. According to Mr. Gentry, when he arrived, he saw Plaintiff on a stretcher in the hallway waiting for the nursing home staff to put her into a room. *Id.* at 57, 64, 69.

23. Mr. Gentry testified that, after spotting his wife, he went to the desk and was informed that he would have to sign some admission papers in order for his wife to be admitted. *Id.* at 58, 69. According to Mr. Gentry, Ms. Millsap informed him that the paperwork had to be signed in order to admit Plaintiff to the home. *Id.* at 58, 69.

24. According to Mr. Gentry, Ms. Millsap then brought him into a room. She presented several documents to him and

showed him where to sign each one. *Id.* at 58–59.

25. Mr. Gentry testified that he did not discuss any of the paperwork with anybody, including Ms. Millsap, and did not read the paperwork before he signed it, including the arbitration agreement. *Id.* at 58, 61.

26. According to both Plaintiff and Mr. Gentry, Plaintiff was not present in the room when Mr. Gentry signed the arbitration agreement. *Id.* at 72–73, 81, 97.

27. At no time did Plaintiff execute a health care proxy, guardianship or power of attorney in favor of Mr. Gentry. *Id.* at 63, 86.

28. At no time was there a court order permitting Mr. Gentry to execute documents on behalf of Plaintiff. *Id.*

29. Plaintiff testified that at no time did Plaintiff discuss arbitration or the arbitration agreement with any of the nursing home staff, including Ms. Millsap. *Id.* at 84–85, 87, 91, 92. *See also id.* at 50–51.

30. Plaintiff further testified that she never saw the arbitration agreement, and never discussed it with anyone. *Id.* at 85–87, 91.

31. According to the testimony of both Plaintiff and Mr. Gentry, Plaintiff never granted Mr. Gentry specific permission—express, verbal, or otherwise—to enter into an arbitration agreement on her behalf. *Id.* at 64, 81, 86–87, 97.

32. However, Plaintiff admits that Mr. Gentry had permission to sign "the admission documents" upon being admitted to Defendant's nursing home. *Id.* at 96. She elaborated on this by testifying that Mr. Gentry had "permission to check [her] in," but did not have permission to sign the arbitration agreement. *Id.* at 97.

33. Plaintiff acknowledges that she has granted Mr. Gentry permission to sign admission documents during prior hospitalizations. *Id.* at 94.

### CONCLUSIONS OF LAW

1. By enacting the Federal Arbitration Act ("FAA"), "Congress declared a national policy favoring arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

2. However, this policy "does not require parties to arbitrate when they have not agreed to do so." *Wheat, First Secs., Inc. v. Green,* 993 F.2d 814, 817 (11th Cir.1993). Accordingly, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Id.*

3. The party seeking arbitration "bears the burden of proving the existence of a valid and enforceable agreement to arbitrate." *Ashburn Health Care Ctr., Inc. v. Poole,* 286 Ga.App. 24, 648 S.E.2d 430, 432 (2007). In this case, Defendant has the burden of proving that the arbitration agreement at issue is valid and enforceable. Nevertheless, the nature and amount of evidence presented in this case is such that the outcome was not a function of the burden. That is, even if Plaintiff had the burden of proving that no valid and enforceable agreement to arbitrate existed, she would have carried her burden.

4. As with other contracts, the existence of an arbitration agreement must be proved by a preponderance of the evidence. *See, e.g., Associated Muts., Inc. v. Pope Lumber Co.,* 200 Ga. 487, 37 S.E.2d 393, 396 (1946).

5. Although it is undisputed that Plaintiff did not sign the arbitration agreement herself, Defendant asserts that Mr. Gentry was Plaintiff's agent and, therefore, had the authority to bind Plaintiff to the agreement by signing his name.

6. In Georgia, an agency relationship is created "whenever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." Ga.Code Ann. § 10–6–1. Because Defendant has not proven, by a preponderance of the evidence, that Plaintiff expressly authorized Mr. Gentry to act on her behalf in signing the arbitration agreement, an agency relationship was created, if at all, by implication.

7. In Georgia, "[a]gency may result where one party has apparent authority to effect the legal relations of another party by transactions with a third party, but it must be emphasized that apparent authority to do an act is created as to a third person when the statements or conduct of *the alleged principal* reasonably cause the third person to believe that the principal consents to have the act done on his behalf by the purported agent." *Brown v. Little,* 227 Ga.App. 484, 489 S.E.2d 596, 599 (1997). Further, "[w]here the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that such an agency exists." *Id.* Also, "marriage alone does not establish an agency relationship between spouses." *Ashburn,* 648 S.E.2d at 432.

8. "[W]here the existence of an agency is relied upon, the burden of proof rests with the party asserting the relationship." *Carter v. Kim,* 157 Ga.App. 418, 277 S.E.2d 776 (1981). Therefore, in this case, Defendant had the burden of proving that Mr. Gentry had actual or apparent authority to bind Plaintiff to the arbitration agreement at issue.

9. As with any agency relationship, an apparent principal is bound by an apparent agent's acts only if that agent is acting within the scope of his apparent authority. *See, e.g., Brumbelow v. N. Propane Gas Co.,* 251 Ga. 674, 308 S.E.2d 544, 546 (1983).

10. Under Georgia law, "[t]he agent's authority shall be construed to include all necessary and usual means for effectually executing it." Ga.Code Ann. § 10–6–50.

11. Even assuming that the version of events put forth by Defendant's witnesses is true, Defendant has failed to meet its burden of proving that Mr. Gentry had actual or apparent authority to bind Plaintiff by signing the arbitration agreement.

12. Even if Plaintiff told Ms. Millsap that her husband would sign the admissions documents on her behalf, it cannot be said that Mr. Gentry's signing of the arbitration agreement was a "necessary" or "usual means" for executing this authority. Accordingly, even if Mr. Gentry did have apparent authority to sign some of the admission documents, such authority cannot be said to extend to his signing of the arbitration agreement. Therefore, Mr. Gentry was acting outside the scope of his authority when he signed the arbitration agreement on Plaintiff's behalf.

13. Importantly, Ms. Millsap herself testified that she told Plaintiff that the paperwork she sought to have signed was "required" for admission to the nursing home and that someone would have to sign it. It was then that, according to Millsap, Plaintiff said that her husband would "take care of it." Because, by its own terms, the arbitration agreement at issue was not required for admission to the nursing home, it cannot be said that Mr. Gentry's signing of the agreement was a "necessary" or "usual" aspect of executing his authority, if

any existed at all. Instead, at best, Plaintiff's statement that Mr. Gentry would "take care of it," made in response to Ms. Millsap seeking signatures for paperwork "required" for admission, gave Mr. Gentry the authority to sign those documents that were, in fact, required for admission to the nursing home.

14. Like the defendant in *Ashburn*, Defendant in this case has failed to establish the existence of an agency relationship. As was the case in *Ashburn*, it has not been demonstrated that Plaintiff in this case "knew about the arbitration agreement, authorized her husband to sign the document, or otherwise agreed to arbitrate claims arising out of her nursing home stay." 648 S.E.2d at 433.

15. Defendant in this case has simply failed to establish that Mr. Gentry acted with actual or apparent authority in signing the arbitration agreement, thereby waiving his wife's litigation rights. *See id.*

16. Accordingly, the arbitration agreement is not enforceable against Plaintiff.

## CONCLUSION

Based upon the foregoing Findings of Fact and Conclusions of Law, Defendant's motion to dismiss, compel arbitration and stay discovery is hereby **DENIED**. Doc. No. 7.