**Cherie JOHNSON, M.D., Plaintiff,**

v.

**UNIVERSITY HEALTH SERVICES, INC., d/b/a University Hospital and Hossam E. Fadel, M.D., P.C., Defendants.**

No. CV 194–033.

United States District Court,
S.D. Georgia,
Augusta Division.

June 3, 1996.

A. Lee Parks, Robert Boyle Remar, Matthew C. Billips, Kirwan, Goger, Chesin & Parks, Atlanta, GA, Timothy Samuel Mirshak, Law Office of Timothy S. Mirshak, Augusta, GA, for Cherie Johnson, M.D.

Raymond Gordon Chadwick, Jr., Robert Perry Sentell, III, Kilpatrick & Cody, Augusta, GA, for University Health Services, Inc. d/b/a University Hospital.

John Chapman Bell, Jr., Pamela Sue James, James L. Bentley, III, Bell & James, Augusta, GA, for Hossam E. Fadel, M.D., P.C.

## *ORDER*

BOWEN, District Judge.

Before the Court in the above-captioned matter are the Motions for Summary Judgment filed by Defendant University Health Services ("UHS") and Defendant Hossam E. Fadel, M.D., P.C. Upon consideration of the briefs as well as oral argument presented by counsel at a hearing before this Court on July 6, 1995, the Court concludes that the Motions for Summary Judgment of both Defendants should be **GRANTED.**

### I. Background

Plaintiff, Cherie Johnson, M.D., specializes in the field of perinatology, an obstetric sub-specialty dealing with the care of patients with high-risk pregnancies. In May of 1992, Defendant University Hospital commissioned a study to determine whether the Augusta, Georgia, community needed additional physicians in the sub-specialty of perinatology. Based upon this study, as well as the expressed desires of Hossam E. Fadel, M.D., ("Dr. Fadel") for an additional staff perinatologist, University Hospital agreed to help Dr. Fadel recruit an additional perinatologist to join his practice. During the spring of 1992, University Hospital and Dr. Fadel recruited Plaintiff to practice as a perinatologist with Dr. Fadel in Augusta, Georgia.

Plaintiff entered into an employment contract with Dr. Fadel's professional corporation on July 7, 1992, that paid her $200,000 for her first year of private practice. She worked for Dr. Fadel from September 14, 1992, until she was terminated on May 5, 1993. Dr. Fadel was the only perinatologist in private practice at University Hospital in Augusta, Georgia.[1] Sometime between September and December of 1992, only a short

---

[1]. At least three other perinatologists practiced during the relevant time period at the nearby Medical College of Georgia in Augusta, Georgia. These perinatologists focused primarily on indigent care.

time after Plaintiff began working for Dr. Fadel, Plaintiff became dissatisfied with her practice because of personal and professional problems with Dr. Fadel. Plaintiff alleges that Dr. Fadel limited the number of new patients allocated to her, contrary to a promise he allegedly made to her that she would be assigned all of his new patients. As a result, Plaintiff concluded that she would not see enough patients over the remainder of her first year of practice to be able to qualify for board certification in obstetrics and perinatology. She alleges that Dr. Fadel did nothing to change this situation after she had brought it to his attention. Dr. Fadel, on the other hand, notes that he attempted to assist Plaintiff in qualifying for her boards and communicated this attempt to hospital administrators. Fadel Deposition, Vol. I at 9.[2]

In December of 1992, Plaintiff and her husband met with Clyburn Davis, a UHS employee charged with physician recruitment, to discuss the problems concerning Dr. Fadel. Plaintiff's desire to establish a practice independent of Dr. Fadel was brought up in this discussion. Davis suggested she first attempt to work things out with Dr. Fadel and expressed his concerns for Plaintiff. Davis also stated that the hospital would be "supportive" of Plaintiff in her efforts to work through any problems with Dr. Fadel. Davis Deposition at 56. Plaintiff alleges Davis told her at this meeting that the hospital could potentially provide her with financial assistance in setting up her own private practice if she could not resolve her differences with Dr. Fadel.

In early February of 1993, Plaintiff began meeting with hospital administrators, including Davis and Lou Imbrogno ("Imbrogno"), Davis' superior and Vice President of Physician Services at University Hospital. Plaintiff and her husband informed them that the situation with Dr. Fadel had not improved and criticized Dr. Fadel's quality of care as not up to date. Davis Deposition at 55; *see also* C. Johnson Deposition at 227–28. Imbrogno allegedly told Plaintiff at this time

that the hospital could help her establish an independent practice, but that it would first survey the Obstetrics Department to determine whether there was a need for an additional perinatologist in the Augusta area, and, if so, whether Plaintiff should fill that need. Imbrogno later allegedly informed Plaintiff that the survey indicated that a need for an additional perinatologist did exist and that the Obstetrics Department wanted her to remain in Augusta. Also, at some point in April of 1993, Imbrogno informed Plaintiff that she would need to tell Dr. Fadel that she was looking at other employment alternatives if any discussion of potential financial assistance were to continue. The hospital apparently believed this step necessary to avoid being accused of interference with Plaintiff's contract with Dr. Fadel. Donald Bray Deposition at 66–68.

Plaintiff's husband, Dr. David Johnson, effectively took charge of negotiations and discussions on Plaintiff's behalf, actively spearheading Plaintiff's efforts to obtain financial assistance from University Hospital. Imbrogno noted that David Johnson called him almost every evening for a total of 30 to 50 times from March 1993 to April 1993. Imbrogno Deposition at 195–96. Imbrogno stated that David Johnson insisted on providing Imbrogno with a laundry list of loan package items he wanted for the Plaintiff and informed Imbrogno that he needed details about what University Hospital could offer Plaintiff to compare against the job opportunities available at other hospitals and health care facilities. *Id.* at 176. David Johnson aggressively pursued potential agreement terms even though Imbrogno informed him the discussions were only hypothetical and after Imbrogno told him he could not continue to discuss the issues. *Id.* at 175, 199.

David Johnson's zealous efforts to obtain financial support for his wife included clandestine recordings of telephone conversations with Imbrogno, Mr. Donald Bray (CEO of University Hospital), and Dr. Carla Morgan–

2. Plaintiff claims that qualification for board certification was a critical factor in her decision to work with Dr. Fadel. Although she cannot remember whether Dr. Fadel promised her all of his new patients before or after she contracted to

work with him, *see* C. Johnson Deposition at 268–69, and although her contract provides for equal allocation of duties, *see infra* note 17, Plaintiff claims this promise was in fact made to her.

Gibbs, an obstetrics physician with staff privileges at University Hospital during this time. None of the parties involved consented to recording their conversations or were aware that they were being recorded. The transcripts of these conversations, which are included in parts of the record, contain long unintelligible lapses and sudden gaps. Plaintiff's husband asserts that he taped these conversations because he could not take notes quickly enough or because Plaintiff was not present when the conversations took place. Defendants argue that Plaintiff selectively recorded portions of the phone conversations in an effort to entrap them into providing Plaintiff with financial assistance.

From February to April of 1993 Plaintiff's husband and, at times, Plaintiff had several discussions with Imbrogno and other University Hospital officials, both over the telephone and in person. Plaintiff alleges that these discussions revolved around the specifics of establishing an independent practice for Plaintiff in Augusta, Georgia. Plaintiff claims these discussions were highly detailed, outlining an agreement which provided that Plaintiff would receive the following: a credit line of approximately $800,000; a guaranteed income of $200,000 for her first year in private practice and $250,000 for her second year; office space, staff, and equipment; and loan forgiveness if she remained in Augusta for two years.

Imbrogno agrees that he and David Johnson had numerous conversations through April of 1993, but categorically denies that they were intended to finalize a financial assistance package with Plaintiff. Instead, Imbrogno provides in his deposition that he clearly delineated that these were hypothetical discussions and that he wished for Plaintiff to reconcile her differences with Dr. Fadel. Imbrogno expressly articulated to Plaintiff and her husband that he would not reduce any discussions or proposals to writing. D. Johnson Deposition at 141. Plaintiff provided nothing by way of a written proposal or confirmation to UHS of these conversations; thus, no written memorialization of the alleged agreement exists. Imbrogno admits discussing Plaintiff's potential options at David Johnson's insistence, but argues that he did so only under the condition that they dealt with a hypothetical situation which he hoped would never occur. At no time, according to Imbrogno, did any of these talks rise to a level of formality or specificity that could create a contractual relation.

On May 3rd or 4th of 1993, a representative of the hospital informed Plaintiff that a meeting of the Obstetrics Department would be held on May 5th to discuss her relationship with Dr. Fadel and to vote on whether she should receive financial assistance in setting up an independent practice. Established hospital policy apparently required departmental approval of any decision to provide substantial financial assistance to physicians. Plaintiff alleges that she was unaware of this policy.

Plaintiff and Dr. Fadel gave short presentations to the members of the Obstetrics Department and hospital administrators at the May 5th meeting. The Obstetrics Department voted against providing financial assistance to the Plaintiff. Plaintiff alleges that Dr. Fadel lobbied several members of the department prior to the meeting, causing the Obstetrics Department to vote against providing financial assistance to her. Members of the department made clear to Plaintiff that the unfavorable vote in no way indicated any adverse opinion about Plaintiff's practice, abilities, or personal attributes. In fact, the record is full of glowing endorsements of Plaintiff's skills as a doctor by University Hospital administrators and physicians alike.[3] Plaintiff, however, alleges that

3. The record fails to substantiate Plaintiff's claims of hostility on the part of the UHS Obstetrics Department; on the contrary, it is full of instances of support and commendation. For example, upon learning of Plaintiff's problems with Dr. Fadel in March of 1993, staff physician Dr. Bruns stated that he had spoken to the physicians in the Obstetrics Department and found they "like Cherie, thought she was a capable physician, were sorry to hear of the difficulties

that had developed between the two physicians, felt there was a need for her at the hospital on staff...." Imbrogno Deposition at 185.

Dr. Watson, Chair of the UHS Obstetrics Department, approached Plaintiff on two occasions, in February and April of 1993, and expressed his desire for her to stay in Augusta, Georgia, to practice. C. Johnson Deposition at 122.

the department voted against financial assistance to the Plaintiff "because it feared competition, especially from a female physician." Plaintiff's Response to Defendants' Motions for Summary Judgment at 7.

Plaintiff learned of the departmental vote and was terminated by Dr. Fadel later that same day.[4] Imbrogno also informed Plaintiff on May 5th that no financial assistance could be afforded her without the approval of the Obstetrics Department as a matter of hospital policy. Plaintiff's privileges at University Hospital, however, were not terminated.

Plaintiff did not attempt to set up an independent practice of her own via a commercial loan. Neither did she attempt to continue her perinatology practice at University Hospital following her separation from Dr. Fadel's practice, despite the fact that physicians practicing in the Obstetrics Department had expressed their desire to have her continue practicing in the hospital.[5] Plaintiff alleges that it would have been futile to obtain a commercial loan or continue working in the area because of the "obvious hostility the Obstetrics Department showed to my establishing a practice independent of Dr. Fadel." Affidavit of Dr. Cherie Johnson at 5, ¶ 15, Exhibit 2 to Plaintiff's Brief in Response to Motion for Summary Judgment.

Plaintiff makes four claims in this case: (1) that she is entitled to treble damages under § 4 of the Clayton Act, 15 U.S.C. § 15, because the Defendants excluded her from the relevant market in violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1, *et seq.*; (2) that University Hospital breached its contract to provide financial assistance, or, (3) in the alternative, that the financial assistance agreement is enforceable under promissory estoppel; and (4) that Dr. Fadel fraudulently induced her to enter into an employment contract with him by promising her that she would receive all of his new patients.

Finally, Dr. Wade Blount's memorandum relating the Obstetrics Department's ultimate decision not to extend the $1.2 million package to Plaintiff stated: "I think Dr. Johnson has been well received by the medical staff, and we would be pleased to see her remain active at University Hospital."

## II. Requirements for Summary Judgment

■ The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgement as a matter of law." Fed.R.Civ.P. 56(c). The applicable substantive law identifies which facts are material in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). When the *moving* party has the burden of proof at trial, that party must carry its burden at summary judgment by presenting evidence affirmatively showing that, "on all the essential elements of its case . . ., no reasonable jury could find for the non-moving party." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991) (en banc). When the *non-moving* party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the non-moving party's claim or by pointing to specific portions of the record which demonstrate that the non-moving party cannot meet its burden of proof at trial, *see Clark,* 929 F.2d at 606–08 (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); merely *stating* that the non-moving party cannot meet its burden at trial is *not* sufficient, *Clark,* 929 F.2d at 608. Any evidence presented by the movant must be viewed in the light most favorable to the non-moving party. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608.

4. Defendant University Hospital later admitted Christopher Croom, M.D., to its medical staff as assistant to Dr. Fadel after the events comprising this lawsuit took place.

5. *See supra* note 3; *see also* Imbrogno Deposition at 201–04.

■ If—and *only* if—the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgement." *Clark*, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982). Rather, the non-moving party must respond by affidavits or as otherwise provided in Fed.R.Civ.P. 56. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. A genuine issue of material fact will be said to exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510.

The clerk has given the non-moving party notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and of the consequences of default; thus, the notice requirements of *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir. 1985), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration. The Court will proceed to review the applicable substantive law and inquire whether the moving party—and, if necessary, the non-moving party—has carried its burden as set forth above. *See Clark*, 929 F.2d at 609 n. 9.

## III. Antitrust Claims

Section 4 of the Clayton Act provides a private cause of action for injury caused by a violation of the antitrust laws:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the dam-

ages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

■ However, federal courts have not interpreted § 4 of the Clayton Act as broadly as its language suggests. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991). To assert an antitrust claim, federal courts require that a plaintiff have antitrust standing. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Antitrust standing is a question of law to be determined by the Court. *Austin v. Blue Cross & Blue Shield*, 903 F.2d 1385, 1387 (11th Cir.1990); *Robles v. Humana Hosp. Cartersville*, 785 F.Supp. 989, 996–97 (N.D.Ga.1992). Generally, two inquiries must be satisfied before a claimant may possess standing to bring an antitrust suit: (1) whether the plaintiff has suffered an antitrust injury; and (2) whether the plaintiff is an efficient enforcer of the antitrust laws. *Todorov*, 921 F.2d at 1448–52. Plaintiff's cause of action fails in this case because she has not suffered an injury for which the antitrust laws were designed to remedy.

■ For a plaintiff to recover under the antitrust laws, he or she

must prove more than injury causally linked to an illegal presence in the market. Plaintiff[ ] must prove antitrust injury, ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The threshold question for analyzing an antitrust claim is whether the conduct of the defendants will lessen competition in the relevant marketplace. *Id.* "Without a showing of actual adverse effect on competition, ... [a claimant] cannot make out a case under the antitrust laws." *Robles*, 785 F.Supp. at 999 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984)). Antitrust claimants cannot base their claims for an antitrust violation simply upon the fact that they are "disappointed competitors who will ... be forced to provide ... services elsewhere." *Bellam v. Clayton County*

*Hosp. Authority,* 758 F.Supp. 1488, 1494 (N.D.Ga.1990). In essence, the antitrust laws operate to prevent harm to competition in the marketplace, not to individual competitors. *See Todorov,* 921 F.2d at 1450 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

 Initially, then, the Court must determine precisely what injury Plaintiff in this case suffered. Plaintiff claims that the concerted activity of Defendants UHS and Dr. Fadel deprived her of a loan package worth approximately $1.2 million and prevented her from competing against Defendants as the only female practitioner in the Augusta market for perinatal services.[6] Plaintiff also claims that the cost of setting up an independent perinatology practice is a prohibitive obstacle to entry into the marketplace and is anti-competitive.[7]

In this case, however, Plaintiff was not simply seeking a position with Defendants nor was she attempting to gain entry into the market for perinatal services. In fact, Plaintiff had both a position and privileges at University Hospital. Instead, what Plaintiff claims she is entitled to amounts to an extraordinary privilege and million-dollar benefit. The behavior that Plaintiff considers anti-competitive consists of the refusal to grace her with an assistance package totalling approximately $1.2 million. In essence, Plaintiff seeks not to be placed on the same footing as her competitors in the Augusta

perinatology market, but rather seeks for this Court to elevate her above her competitors with a $1.2 million windfall. Defendant UHS's refusal to provide this extraordinary benefit and establish a separate perinatology practice at little cost or risk to the Plaintiff is by no means tantamount to excluding her from the marketplace. Plaintiff's "injury," if in fact she has suffered one at all, is simply not the type of injury the anti-trust laws were designed to protect.

Even if Plaintiff had suffered some cognizable injury in this case, the Defendants were not the proximate cause of it.[8] Defendants did not exclude Plaintiff from the marketplace. Defendants never prevented Plaintiff from practicing her specialty in the Augusta area; Plaintiff retained her privileges and could have set up a practice on her own at any time. Defendant UHS even offered to assist Plaintiff in establishing her practice in more limited ways than providing her with an extraordinary financial benefit, such as helping her to obtain a commercial loan.[9] While Plaintiff would have a more difficult time setting up her own practice without a risk-free grant of $1.2 million, other options were certainly available to her.

As an alternative, Plaintiff clearly could have continued her practice at University Hospital independent of Dr. Fadel. The record clearly indicates that obstetricians and members of the University Hospital administration articulated their wishes that Plaintiff

**6.** As a general rule, a court must determine the relevant geographic and product markets before it evaluates the merits of an antitrust claim. *See Robles,* 785 F.Supp. at 997 n. 5 (citing *Pontius v. Children's Hosp.,* 552 F.Supp. 1352, 1365 (W.D.Pa.1982)). For purposes of this analysis, it is assumed that the relevant geographic market is the area in and surrounding Richmond, Columbia, and Aiken Counties and the relevant product market is perinatology/obstetrics-gynecology services. It is also assumed for purposes of this analysis that Defendants' actions affect interstate commerce. *See Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991).

**7.** Plaintiff's claim turns on the theory that University Hospital created a recruitment policy giving existing physicians veto power over hospital decisions to provide financial assistance for establishing independent practices. Plaintiff ar-

gues that Defendants UHS and Dr. Fadel conspired to prevent her from receiving the financial assistance package. Plaintiff provides that such assistance was a relatively routine matter for the hospital; however, the record indicates that financial assistance, at least of this magnitude and under these circumstances, was unprecedented at the hospital.

**8.** The Supreme Court has recognized that Congress intended common-law tort concepts such as proximate cause and directness of injury to apply in the context of litigation under §§ 4 and 7 of the Clayton Act. *See Todorov,* 921 F.2d at 1448 (discussing *Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 529–35, 103 S.Ct. 897, 904–07, 74 L.Ed.2d 723 (1983)).

**9.** *See, e.g.,* Bray Deposition at 93; Imbrogno Deposition at 222.

stay at University Hospital. Plaintiff's privileges were not terminated at University Hospital. Plaintiff's only rationale for not pursuing this alternative is the result of perceived hostility on her part.[10] From the record, it is apparent that Plaintiff was well-received by the University Hospital staff and administration.[11] Plaintiff was not "driven" from her position in Dr. Fadel's practice or from the opportunity to continue practicing in the Augusta area; instead, Plaintiff made a conscious and voluntary decision to leave Augusta, Georgia, and relocate to Spokane, Washington. Plaintiff herself was the proximate and direct cause of any injury to her practice.

It is my conclusion that Plaintiff has not suffered an antitrust injury and has no correspondent antitrust standing. Summary judgment on Plaintiff's antitrust claims against both Defendants is therefore appropriate.

### IV. Plaintiff's State Law Claims

Plaintiff brings claims for breach of contract and promissory estoppel against University Hospital under Georgia law. Plaintiff also alleges a claim under Georgia law for fraud against Dr. Fadel.[12] With respect to Plaintiff's breach of contract and promissory estoppel claims, the very possibility that such a complex agreement could in fact exist by parol communications which were unspecific and distinctly unilateral, seems chimerical—however, both parties treat this case as if such an agreement were actually feasible, and therefore so must this Court.

### A. Plaintiff's Breach of Contract Claim.

■ Under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13–3–1.

A contract is "an agreement between two or more parties for the doing or not doing of some specified thing." *Id.* An enforceable contract requires a meeting of the minds of the parties, mutuality, and the clear expression of the terms of the agreement. *See Donohue v. Green,* 209 Ga.App. 381, 433 S.E.2d 431 (1993).

■ A contract is not complete or enforceable until there is a meeting of the minds as to all essential terms. *Complete Concepts, Ltd. v. General Handbag Corp.,* 880 F.2d 382 (11th Cir.1989); *Clark v. Schwartz,* 210 Ga.App. 678, 436 S.E.2d 759 (1993). Both parties must concur in all terms of the proposed contract, agreeing to the same thing in the same sense. *Associated Mutuals, Inc. v. Pope Lumber Co.,* 200 Ga. 487, 491, 37 S.E.2d 393, 398 (1946).

■ Clarity and specificity of essential terms are also requirements of a valid contract. *See Donohue,* 209 Ga.App. at 382, 433 S.E.2d at 432; *see also King v. State Farm Mut. Auto. Ins. Co.,* 117 Ga.App. 192, 160 S.E.2d 230 (1968) (an enforceable contract must be specific as to time and subject matter). Mere contemplation or discussion of specific contractual terms does not in and of itself make them enforceable; instead, they must be assented to and agreed upon. *Fidelity & Deposit Co. of Maryland v. West Point Constr. Co.,* 178 Ga.App. 578, 580, 344 S.E.2d 268, 270 (1986); *see also Loy's Office Supplies, Inc. v. Steelcase, Inc.,* 174 Ga.App. 701, 331 S.E.2d 75 (1985). A party seeking to enforce a contract bears the burden of proving all of these essential elements of the contract and that the opposing party assented to all essential terms. *Associated Mutuals,* 200 Ga. at 491, 37 S.E.2d at 398.

■ Defendant University Hospital flatly denies that it entered into any contract to provide financial assistance to Plaintiff and

---

**10.** Plaintiff concludes that the decision by the Obstetrics Department not to provide her with the $1.2 million package amounts to a decision that Plaintiff was unnecessary and unwelcome in the Augusta perinatal/obstetrics-gynecology market. As a result, Plaintiff believes this disapproval by her principal referral base would have effectively foreclosed her from any opportunities to compete meaningfully in the market. To the

contrary, the record contains clear and unequivocal endorsements of Plaintiff's personal and professional attributes.

**11.** *See supra* note 3.

**12.** Plaintiff dismissed her claim for tortious interference with business relations against Dr. Fadel.

points out that none of the terms Plaintiff seeks to enforce were ever reduced to writing. Defendant argues that it never reached a mutual, binding agreement with Plaintiff; that the statute of frauds applies since the alleged contract provided for financial assistance over a two-year period; that contracts *in futuro* are unenforceable under Georgia law; and that the agreement as alleged by Plaintiff would have actually been illegal. Plaintiff, however, argues that sufficient contractual definiteness was achieved during negotiations with Defendant UHS to establish a valid contract and that the agreement reached by the parties is enforceable under Georgia law.

Plaintiff attempts to infer mutuality from her own unilateral assent, but provides no evidence that, at any point, University Hospital agreed to her or her husband's "wish list." What she does provide is an often confusing jigsaw puzzle of preliminary discussions she and her husband had with various hospital officials on a number of topics from late 1992 to early 1993. In lieu of a concrete, written contract, Plaintiff strains to piece together a million dollar agreement from multiple discussions regarding a variety of different subjects and made with several different members of the UHS administration, including Clyburn Davis, Lou Imbrogno, Don Bray, and others. These discussions took place under a variety of circumstances occurring over several months. At all times, the terms of the alleged agreement were inherently indefinite and couched in hypotheticals. *See* Imbrogno Deposition at 165, 176. Plaintiff acknowledges that she cannot even provide a clearly defined point in time when these preliminary conversations actually crystallized into a legally enforceable meeting of the minds; she states instead that she believes an agreement was reached "sometime in April." D. Johnson Deposition at 138.

Plaintiff's testimony also indicates that she herself considered the talks non-binding. She continued to look for employment elsewhere throughout the discussion period.[13] Her husband indicated to Imbrogno that he could not know what to shop around for unless he had detailed information from University Hospital. Plaintiff further indicates that she was uncertain as to when or if she would have left the employ of Dr. Fadel even if the financial assistance package had been offered to her.[14] At most, Plaintiff presents a scenario that can best be described as a "commencement of negotiations," but is not rationally capable of characterization as a mutual assent.

Plaintiff's claim also fails to set forth a clear and specific expression of the agreement she seeks. For example, she is unable to recall the terms or details of the forgivable loan, the very linchpin of the agreement which Plaintiff deemed indispensable to starting her independent perinatology practice.[15] She does not know exactly when an agreement was reached, but nevertheless asks this Court to bind UHS thereto.

Plaintiff's claim for enforcement of an oral contract simply rests on too vague a foundation. Ultimately, Plaintiff asks this Court to

---

**13.** Plaintiff indicated in her deposition that she had been contacted by out-of-town medical groups at least as late as April 1993. C. Johnson Deposition at 179. In early April 1993, David Johnson informed Imbrogno that he and Plaintiff had not committed to remaining in Augusta but were looking at opportunities across the country. D. Johnson Deposition at 229–30.

**14.** When asked in her deposition whether she would have left Dr. Fadel if she had received financial assistance, the following exchange ensued:

Q. Are you telling me you weren't planning to quit if you'd gotten the loan package from University?
A. Eventually. I don't know what would have transpired. Unfortunately, we never reached that bridge.

. . .

Q. Okay. So you don't know whether you would have taken the loan package or when you would have quit even if University had offered this loan package that you're claiming should have offered (sic) but didn't get?
A. I never had those decisions before me to make, so I'd only be guessing.

. . .

Q. So you're saying if they had given you the loan package, you were going to quit Dr. Fadel, right?
A. Eventually, I suppose.
C. Johnson Deposition at 257–59.

**15.** *See* C. Johnson Deposition at 57, 72.

construe the existence of a detailed contract from the separate discussions of David Johnson with various individuals, most notably Lou Imbrogno; from what was said in second hand conversations to which Plaintiff and her husband were not a party[16]; from ambiguous statements of "support" made to Plaintiff by Imbrogno and Davis in her dealings with Dr. Fadel and in the event she could not work out her differences with him; and from parties participating in preliminary talks without the formal approval of the Obstetrics Department at University Hospital. Such a construction flies in the teeth of fundamental principles of contract law in Georgia.

Of particular importance in assessing Plaintiff's claim is the involvement of her husband. David Johnson's "intercession" rises to a level of outright spousal interference. David Johnson actively pursued a commitment from Imbrogno and University Hospital and engaged in an aggressive telephone campaign to relieve Plaintiff of her obligation with Dr. Fadel after she had worked for him for only a few months. He secretly recorded select portions of various conversations with a number of individuals without their consent, while at other times he spoke over the speaker phone while the Plaintiff surreptitiously listened in on the conversation. It is even uncertain whether Imbrogno and other hospital administrators actually understood David Johnson to be negotiating on Plaintiff's behalf. Such "cloak and dagger" activity lends little credence to Plaintiff's claims that she negotiated the terms of an extensive and expensive financial assistance package in good faith with University Hospital. In light of all facts in the record, it is my conclusion that Plaintiff has not presented a valid claim for breach of contract because the alleged agreement is fatally unspecific and no mutuality or meeting of the minds ever existed in this case. Therefore, summary judgment on Plaintiff's breach of contract claim is appropriate.

### B. Plaintiff's Promissory Estoppel Claim.

■ Georgia law codifies the equitable principle of promissory estoppel as follows:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

O.C.G.A. § 13-3-44(a). To be able to enforce a promise under promissory estoppel, however, there must still be sufficient definiteness as to the essential terms and details of an agreement. *See Pepsi–Cola Co. v. Wright,* 187 Ga. 723, 2 S.E.2d 73 (1939); *Fidelity & Deposit Co. of Maryland v. West Point Constr. Co.,* 178 Ga.App. 578, 580, 344 S.E.2d 268, 270 (1986) (reliance on promise unreasonable where no specific terms were discussed or agreed upon).

■ Promissory estoppel simply relaxes the consideration requirement for breach of contract claims and allows mutual promises to serve as the consideration supporting the agreement. *Klag v. Home Ins. Co.,* 116 Ga. App. 678, 158 S.E.2d 444 (1967). Thus, the requirements of mutuality and specificity apply equally to promissory estoppel and breach of contract claims. *See, e.g., McMurray v. Bateman,* 221 Ga. 240, 144 S.E.2d 345 (1965); *Clement A. Evans & Co. v. Waggoner,* 197 Ga. 857, 30 S.E.2d 915 (1944).

■ Plaintiff's promissory estoppel claim suffers from the same infirmities as her breach of contract claim. The promise Plaintiff patches together possesses multiple points of origin. It is based upon a succession of conversations with various individuals, some formal and others informal, some of which Plaintiff heard firsthand, and others to which neither the Plaintiff nor her husband was a party. Like her breach of contract claim, Plaintiff's promissory estoppel claim simply rests on too vague a foundation and fails to evidence some meeting of the minds.

---

**16.** For example, Plaintiff claims that Ed Burr, legal counsel for University Hospital, oversaw the discussions regarding financial assistance. The evidence Plaintiff offers in support of this claim is that Imbrogno allegedly told her he had spoken with Burr about the situation and that he was addressing the legal issues. C. Johnson Deposition at 56–57.

The requisite specificity and mutuality, quite simply, are nowhere to be found. As a result, summary judgment is appropriate on Plaintiff's promissory estoppel claim against UHS.

 Even if Plaintiff and UHS had actually reached a mutual agreement to provide financial assistance, this situation presents a textbook case for application of the Georgia statute of frauds. O.C.G.A. § 13–5–30(5) provides that "any agreement that is not to be performed within one year from the making thereof" must be in writing. Furthermore, the statute of frauds applies equally to breach of contract and promissory estoppel claims. *See Loy's,* 174 Ga.App. 701, 331 S.E.2d 75.

It is the undisputed understanding of both the Plaintiff and David Johnson that the loan package would be for a period of two years. *See* C. Johnson Deposition at 71; D. Johnson Deposition at 142. No written agreement exists. Plaintiff asserts that the financial assistance agreement was not an employment agreement and therefore should not be governed by the statute of frauds. However, section 5 of the statute of frauds clearly states that it covers **"any agreement,"** not just agreements in the employment context. The unambiguous text of the statute of frauds renders the alleged agreement unenforceable regardless of whether Plaintiff asserts her claims under a breach of contract or a promissory estoppel theory. Summary judgment under both theories, therefore, is proper.

## C. Plaintiff's Fraud Claim against Dr. Fadel.

Plaintiff claims Dr. Fadel intentionally misrepresented his intent to refer all new patients to Plaintiff, to help her establish a full-time practice, and to have her become a shareholder in his practice. Plaintiff also alleges that Dr. Fadel intentionally limited Plaintiff's patients to prevent her from being able to qualify for board certification.

Under Georgia law, Plaintiff must prove five elements in her action for fraud: (1) a false representation of a past or present fact; (2) scienter; (3) intention to induce the plaintiff to commit an act or refrain from committing an act; (4) reliance; (5) damage proximately resulting therefrom. *See* O.C.G.A. § 51–6–1; *see also Ekstedt v. Charter Medical Corp.,* 192 Ga.App. 248, 384 S.E.2d 276 (1989); *Parsells v. Orkin Exterminating Co.,* 172 Ga.App. 74, 322 S.E.2d 91 (1984).

 Plaintiff has asserted that she and Dr. Fadel had a "joint expectation" that she would receive all of the new patients. C. Johnson Deposition at 271. Since fraud requires a misrepresentation of fact, not intent, promises as to future conduct will not generally support a claim for fraud. *Hill v. Stewart,* 93 Ga.App. 792, 796, 92 S.E.2d 829, 832 (1956). Plaintiff must therefore show that Dr. Fadel knew at the time he made the alleged promise that he did not intend to honor it. Other than Plaintiff's allegations, no evidence exists in the record to indicate that Dr. Fadel intended to deceive Plaintiff when he allegedly made the promises.

What does appear to have occurred is that Plaintiff and Dr. Fadel understood their employment relationship in two entirely different contexts. Plaintiff believed she would get all of Dr. Fadel's new patients; Dr. Fadel believed the employment agreement clearly set forth the equal division of patients.[17] Such a situation may be an outright misunderstanding or miscommunication, but it is certainly not the basis for a claim of fraudulent conduct.

Furthermore, Plaintiff has failed to show reliance upon Dr. Fadel's alleged promise. Plaintiff's argument turns on the allegation that Dr. Fadel fraudulently promised Plaintiff she could have all new patients, thus inducing her to sign the employment contract. Plaintiff further claims that this promise was critical in her decision to work for Dr. Fadel. However, Plaintiff concedes

17. The employment agreement states:

All aspects/duties of the practice of perinatology will be the same for both physicians in the practice. Call coverage will be evenly divided between Dr. Fadel and Employee, including holiday coverage.

Exhibit 1 to Motion for Summary Judgment by Defendant Fadel, Employment Agreement attached to Affidavit of Dr. Fadel at 1–2.

that she cannot remember whether Dr. Fadel made the alleged promise regarding patient assignment before or after she signed her contract with Dr. Fadel. C. Johnson Deposition at 268–69. The contract Plaintiff signed with Dr. Fadel did not provide that Plaintiff would receive all new patients, but rather divided patients equally between Plaintiff and Dr. Fadel. There exists no evidence in the record to support the notion that Dr. Fadel prevented Plaintiff from reading the contract or altered the contract after Plaintiff signed it. Certainly, Plaintiff was not an unsophisticated party to the contract. She had an opportunity and an obligation to read the employment contract before she signed it. Plaintiff has failed to show fraudulent intent on the part of Dr. Fadel as well as her reliance on his alleged promises. Accordingly, because Plaintiff has failed to make out even a prima facie claim for fraud, summary judgment on Plaintiff's fraud claim is appropriate.

## V. Conclusion

Both Defendants' Motions for Summary Judgment are hereby **GRANTED** in their entirety. The Clerk of the Court is directed to **ENTER JUDGMENT** in favor of the Defendants, **CLOSE THE CASE,** and **TERMINATE** all pending motions in this case. All costs are taxed against the Plaintiff.

**ORDER ENTERED.**